**CASE NOT YET SCHEDULED FOR ORAL ARGUMENT**

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| GREG BURLEY, | ) |
| | ) |
| Appellant, | ) Appeal No. 14-7051 |
| | ) |
| v. | ) |
| | ) C.A. No. 11-1222 |
| NATIONAL PASSENGER RAIL CORP. | ) |
| D/B/A AMTRACK, | ) |
| | ) |
| Appellee. | ) |

# APPELLANT'S BRIEF

John F. Karl, Jr.

McDonald & Karl

1025 Connecticut Avenue, N.W.

Suite 615

Washington, D.C. 20036

(202) 293-3200

Counsel for Appellant

**Related Cases:**

To the best of our knowledge, there are no relating cases pending before this Court.

Respectfully submitted,

/S/ John F. Karl, Jr.

John F. Karl, Jr.

McDonald & Karl

1025 Connecticut Avenue, N.W.

Suite 615

Washington, D.C. 20036

(202) 293-3200

Counsel for Appellant

## TABLE OF CONTENTS

JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED FOR REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTES AT ISSUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I.    COURSE OF PROCEEDINGS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    II.    STATEMENT OF THE FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        A.    The Derailment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        B.    Smith's "Investigation". . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        C.    Outcome of Charges Against Ebersole and Burley. . . . . . . . 10

        D.    Amtrak's Internal Disciplinary Proceedings. . . . . . . . . . . . . 12

        E.    The LERB Decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        F.    Burley's Punishment Compared to Others. . . . . . . . . . . . . . 16

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    I.    Standard of Appellate Review and Applicable Legal Principles. . . 19

    II.    A Reasonable Jury Could Decide Amtrak's Reasons for
        Terminating Burley Were Inaccurate, Misleading or Incomplete
        Because Smith Manipulated the Disciplinary Process. . . . . . . . . . 22

        A.    The District Court Erred in Identifying the

i

Decision-Maker. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

B.  The District Court Erred in its Analysis of the
Blue Signal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

C.  The District Court Misapplied *Brady* and *Fischbach*. . . . . . 30

III.  A Reasonable Jury Could Infer Pretext from Amtrak's
"Investigation". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

IV.  The District Court Erred in Ruling Ebersole Was Not a Proper
Comparator. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

A.  The Law Governing Comparators. . . . . . . . . . . . . . . . . . . . 43

B.  The Identity of the Decision-Maker. . . . . . . . . . . . . . . . . . . 47

C.  There are Disputes of Material Fact as to Whether
Ebersole is an Appropriate Comparator. . . . . . . . . . . . . . . . 48

D.  Improper Fact-Finding in Analyzing Conduct and
Responsibilities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

1.  Finding Presence on the Locomotive Was
Material. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

2.  Finding of Material Differences in Responsibilities. . . 51

3.  At Least Equal Culpability of Ebersole. . . . . . . . . . . . 52

4.  Misplaced Reliance on *Phillips v. Holladay
Prop. Servs.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

V.  The District Court Erred in Analyzing the Spoliation Issue. . . . . . 55

VI.  A Reasonable Jury Could Find Burley Was Denied a Waiver
for Discriminatory Reasons. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

ii

VII.  Alternatively, A Jury Could Find Liability Because Caucasian
      Engineers Terminated by Pesce and Sherlock were Treated
      More Favorably Than Burley. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

      A.    Engineers Disciplined by Pesce. . . . . . . . . . . . . . . . . . . . . . . 58

      B.    Engineers Disciplined by Sherlock. . . . . . . . . . . . . . . . . . . 60

      C.    Engineers Disciplined by Others. . . . . . . . . . . . . . . . . . . . . 61

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

CERTIFICATE OF WORD COUNT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

iii

# TABLE OF AUTHORITIES

| Cases | Page |
|---|---|

*Aka v. Washington Hospital Center*, 156 F.3d 1284 (1998)................. 22

*Ash v. Tyson Foods, Inc.*, 546 U.S 454 (2006)......................... 23-23

*Barnett v. PA Consulting Group, Inc.*, 715 F.3d 354 (D.C. Cir. 2013)...... 44, 54

*Batson v. Kentucky,* 476 U.S. 79 (1986)................................. 46

*Beaird v. Seagate Technology, Inc.*, 145 F.3d 1159 (10th Cir. 1998)......... 23

*Brady v. Office of Sergeant at Arms*, 520 F.3d 490

    (D.C. Cir. 2008)............................. 2, 17, 21-23, 30-31, 43

*Charbonages de France v. Smith*, 597 F.2d 406 (4th Cir. 1979)............. 20

*Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012)................. 44, 45, 60

*Cones v. Shalala*, 199 F.3d 512 (D.C. Cir. 2000)......................... 56

*Cuddy v. Carmen*, 762 F.2d 119 (D.C. Cir. 1985)....................... 33

*Daniels v. Tapella,* 571 F. Supp. 2d 137 (D.D.C. 2008).................... 21

*Davis v. Team Elec Co.*, 520 F.3d 1080 (9th Cir. 2008).................... 21

*Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830 (1996)..................... 25

*Fischbach v. District of Columbia Dept. Of Corrections*, 86 F.3d 1180

    (1996). .................................... 2, 17, 22, 26, 30-31

*George v. Leavitt,* 407 F.3d 405 (D.C. Cir. 2005)........................ 43, 53

iv

*Gerlich v. U.S. Dep't of Justice*, 711 F.3d 161 (D.C. Cir. 2013). . . . . . . . . . . . . 36

*Gleklen v. Democratic Campaign Committee*, 199 F.3d 1365 (D.C. Cir. 2000). . 30

*Gordon v. Kidd*, 971 F.2d 1087 (4th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Greenberg v. Food & Drug Admin.*, 803 F.2d 1213 (D.C. Cir. 1986). . . . . . . . . 21

*Hamilton v. Geithner*, 666 F.3d 1344 (D.C. Cir. 2012). . . . . . . . . . . . . . . . . . . . 22

*Hicks v. St. Mary's Honor Center*, 509 U.S. 502 (1993). . . . . . . . . . . . . . . . . . 56

*Holbrook v. Reno,* 196 F.3d 255 (D.C. Cir. 1999). . . . . . . . . . . . . . . . . . . . . . 43, 48

*Laxton v. Gap, Inc.* 333 F.3d 572 (5th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . 22

*\*Mastro v. Potomac Electric Power Co.*, 447 F.3d 843 (D.C. Cir.

    2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 18, 36-42

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). . . . . . 19

*McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273 (1976). . . . . . . 43

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). . . . . . . . . . . . 33, 43, 44

*Miller-El v. Dretke*, 545 U.S. 231 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Neuren v. Adducci, Mastriani, Meeks & Schill,* 43 F.3d 1507 (D.C. Cir. 1995). . 43

*Olsen v. Marshall & Isley Corp.*, 267 F.3d 597, 601 (7th Cir. 2001). . . . . . . . . . 62

*\*Pardo-Kronemann v. Donovan*, 601 F.3d 599 (D.C. Cir 2010). . . . . 19, 28, 55, 57

*Philbrick v. Holder,* ___ Fed.App'x ___, 2014 WL 4627704 (6th Cir. September,

    16, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Phillips v. Holladay Prop. Servs.*, 937 F.Supp. 32 (D.D.C. 1996). . . . . . . . . . 53-54

*Porter v. Shah*, 606 F.3d 809 (D.C. Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Radentz v. Marion County*, 640 F.3d 754 (7th Cir. 2011). . . . . . . . . . . . . . . . . 54

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000). . . . . . . . . . 20

*Robinson v. PPG Industries*, 23 F.3d 1159 (7th Cir. 1994). . . . . . . . . . . . . . . . . 20

*Rodgers v. White*, 657 F.3d 511 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . 45-46

*Sharp v. Aker Plant Services Group, Inc.*, 726 F.3d 789 (6th Cir. 2013). . . . . 25-26

*Smith v. Chrysler Corp.*, 155 F.3d 799 (6th Cir. 1998). . . . . . . . . . . . . . . . . . . . 23

*Sosa v. Alvarez-Machain,* 542 U.S. 692 (2004). . . . . . . . . . . . . . . . . . . . . . . . . 24

*\*Staub v. Proctor Hospital,* 562 U.S. ___, 131 S.Ct. 1186, 179 L.Ed.2d 144

(2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 17, 23-26, 35, 47

*Tao v. Freeh*, 27 F.3d 635 (D.C. Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Tolan v. Cotton*, 574 U.S. ___, 134 S. Ct. 1981 (2014). . . . . . . . . . . . . . . . . . . 57

*Wexler v. White's Fine Furniture*, 317 F.3d 564 (6th Cir. 2003). . . . . . . . . . . 22-23

**Statutes**                                                                    **Page**

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e Title VII. . . . . . . . 1, 3

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

DC Human Rights Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

| **Other Authority** | **Page** |
|---|---|

Suzanne B. Goldberg, *Discrimination by Comparison*, 120 Yale. L.J. 728

(2011)................................................................ 44

Ernest F. Lidge III, *The Courts' Misuse of the Similarly Situated Concept*

*in Employment Discrimination Law*, 67 Mo. L. Rev. 831 (2002)......... 45

Charles A. Sullivan, *The Phoenix from the Ash: Proving Discrimination*

*by Comparators*, 60 Ala. L. Rev. 191 (2009)........................... 45

*Cases Chiefly Relied Upon are Marked with an Asterisk

# APPELLANT'S BRIEF

## JURISDICTIONAL STATEMENT

Subject matter jurisdiction is premised on Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972 and the Civil Rights Act of 1991, 42 U.S.C. §2000e *et seq.* ("Title VII"). The district court had pendent jurisdiction over Burley's claims brought under the District of Columbia Human Rights Act. D.C. Code §2-1402.11(a).

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 to review the district court's final order and opinion entered on March 31, 2014. APP 035. The appeal was timely filed on April 20, 2014. APP 034.

## ISSUES PRESENTED FOR REVIEW

Appellant respectfully suggests this appeal raises the following issues:

1.      Whether a reasonable jury could find that Amtrak Assistant Superintendent Smith, a Caucasian, was an actual decision-maker, under *Staub v. Proctor Hospital,* —— U.S. ——, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011), when he conducted an investigation during which he learned that the Caucasian conductor who abandoned the locomotive while the train was moving, but did not alert the engineer, then concealed the engineer's lack of knowledge in his reports to his Amtrak superiors, thus placing the blame for the derailment solely on Burley, an

1

African-American, and denied Burley a "waiver," and he was the primary witness against Burley?

2.    Whether the district court erred in its factual analysis of the Blue Signal evidence and misapplied this court's decisions in *Brady v. Office of Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008), and *Fischbach v. District of Columbia Dept. Of Corrections*, 86 F.3d 1180 (1996), in ruling as a matter of law that Amtrak satisfied the "sincere belief" standard?

3.    Whether a reasonable jury could infer pretext from Amtrak's sham "investigation" and whether the district court erred in ruling as a matter of law that Amtrak satisfied the standards for an investigation articulated in *Mastro v. Potomac Electric Power Co.*, 447 F.3d 843 (D.C. Cir. 2006).

4.    Whether the trial court erred in ruling as a matter of law that Ebersole was not a proper comparator under the circumstances present here, where the conductor was "in charge" of the "general management of the train" and was responsible for directing Burley's actions at the time of the derailment of the Amtrak locomotive and in overlooking the most significant similarities between Burley and Ebersole, *i.e.*, that they shared responsibility for the same derailment and were charged with largely identical offenses and in resolving multiple factual disputes and drawing inferences against Burley?

2

5.      Whether the trial court erred in analyzing the spoliation issue?

6.      Whether a reasonable jury could find Burley was denied a "waiver" for discriminatory reasons?

7.      Alternatively, whether a reasonable jury could find Amtrak liable because Caucasian engineers who committed safety offenses that were comparable or worse were treated more favorably by Pesce and Sherlock than Burley?

## STATUTES AT ISSUE

Resolution of the issues raised in the appeal turns on the interpretation of the Title VII and the DCHRA, which bar discrimination on the basis of race in discipline and termination.

The relevant portion of Title VII provides: "It shall be an unlawful employment practice for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his . . . "terms, conditions, or privileges of employment because of such individual's race . . ." 42 U.S.C. §2000e-e(a)(1).

The relevant portion of the interpretation of the DCHRA provides: It shall be an unlawful discriminatory practice to . . . wholly or partially for a discriminatory reasons based upon the actual or perceived: race . . . to discharge any individual; or otherwise to discriminate against any individual with respect to his . . . terms, conditions, or privileges of employment . . ." D.C. Code §2-1402.11.

3

## STATEMENT OF THE CASE

### I.   COURSE OF PROCEEDINGS

The parties are Greg Burley, Appellant ("Burley" or "plaintiff") and Appellee, the National Passenger Rail Corp. ("Amtrak").

After exhausting his administrative remedies before the EEOC, Burley brought suit in U.S. District Court.  Amtrak moved for summary judgment following the completion of discovery. After Burley filed his opposition, Document 34, Amtrak filed a Reply Memorandum and "Reply to Plaintiff's Statement of Material Facts Omitted by Defendant."  Document #43.  Burley filed a Motion to Strike the Reply or for Leave to File a Response.  Document # 46.  On August 19, 2013, the district court denied the Motion to Strike, but granted Burley the opportunity to file a Surreply.  APP 032.

The district court entered summary judgment in Amtrak's favor, and Burley filed a timely Notice of Appeal.

### II.   STATEMENT OF THE FACTS

Amtrak terminated Burley, an African-American train engineer, and suspended his locomotive engineer certificate for disregarding a blue signal and derailing an engine on October 20, 2007.

4

In February 2009, a Locomotive Engineer Review Board of the Federal Railroad Administration of the U.S. Department of Transportation ("LERB") determined that there was a lack of "substantial evidence" to support a finding that the blue signal was properly displayed. APP 011-012 (reversing Amtrak's suspension of Burley's certification because it was not "supported by substantial evidence").

Two years after his firing, Burley was reinstated to his job. Although he was reinstated, Burley did not receive back pay. APP 283.

### A.    The Derailment

On the day in question, Burley, working under conductor Jerry Ebersole, a Caucasian, was moving a rail car in the Ivy City yard when the engine derailed.

Under mandatory Northeast Operating Rules Advisory Committee ("NORAC") and Amtrak's rules, when an engineer is not located on the leading end of the engine's movement, "a crew member must be stationed on the leading end of the movement to observe conditions ahead" and "[i]f signals from the crew member cannot be received by the Engineer, the movement must be stopped immediately." APP 336. Amtrak Special Instruction 116-S1 required Ebersole either to be on the leading end of the locomotive or on the ground ahead of the locomotive to warn Burley of the derail ahead. APP 338-339.

Burley was not on the leading end. Rather, Ebersole was stationed on the leading end to observe conditions ahead and to maintain communications with Burley. As the engine moved, Ebersole, in violation of NORAC and Amtrack rules, jumped off the moving locomotive and did not alert Burley that he had left his post. Burley could not have seen Ebersole get off the locomotive because Ebersole dismounted from Burley's blind side, opposite Burley's location. Burley did not know and could not have anticipated that the conductor would abandon his post by jumping from a moving train without telling him. Because Burley believed Ebersole was still in the front of the engine observing the conditions ahead and directing Burley's actions, Burley did not stop.

Prior to the accident, the radio dispatcher communicated to Burley it was safe to move to within 50 feet of the maintenance building,[1] *i.e.,* past the derailer. Burley was going around a curve at 2-3 miles per hour. He did not see a Blue Signal.[2] APP 510-519. Blue signals are often paired with safety devices called derailers that automatically force locomotives off the track when they are in the "applied" derailing

---

[1]      This was the crew's last assignment of the day. APP 275. Burley was released to enter the yard with the locomotive after he was informed that the maintenance staff had completed its work for the day. APP 307.

[2]      A blue signal takes the form of a blue flag or sign and may also display a flashing blue light. APP 273.

position. Engineers are banned from operating a locomotive over applied derailers. Burley could not see whether the derailer was applied because his view was obstructed.[3]

The derailment caused no personal injury; total property damage from the derailment was $3,098.45.  APP 208.

The blue light at the accident site was not damaged. Had the locomotive struck the flag while it was deployed in a standing position, it would have been damaged. APP 528-529.

Not only was Ebersole primarily responsible for the derailment because he left his post without alerting the engineer, he was also responsible because under NORAC rules, the conductor remained "in charge ... as to the general management of the train," and Ebersole was responsible for directing Burley's actions.  APP 337.

### B.    Smith's "Investigation"

Ebersole telephoned Assistant Superintendent for Terminal Services L. David Smith, the Amtrak supervisor on duty, to report the derailment. Smith was the supervisor of Ebersole and Burley.  When Smith first arrived, he and Ebersole had a

---

[3]    Amtrak assigned two men to staff Burley's locomotive precisely because Burley's view would be obstructed.  APP 518-519.

7

private conversation. The three men gave written and recorded oral statements. APP 522-523, 634.

Therefore, immediately after the derailment, Smith was told that Ebersole jumped from the moving train on the opposite side of the train from Burley where Burley could not see him and that Burley did not know Ebersole had jumped off the train. APP 638-640.

Despite knowing that a principal cause of the derailment was Ebersole's jumping off a moving train and abandoning his post without telling Burley, Smith told Amtrak that he concluded Burley was responsible for the derailment and more culpable than the other crew members. APP 159.

Smith prepared an Incident Report dated October 20, 2007, which stated that the "blue flag derail" was "applied." He said so even though the blue light was not damaged. Smith could have had no personal knowledge whether the Blue Signal was applied because he was not present at the derailment. APP 207. Smith subsequently testified under oath that he saw a blinking blue light under the locomotive, and he claims to have photographed the light.

Smith's original Incident Report dated October 20, 2007 stated "The Engineer failed to stop for an applied blue-flag derail. The Conductor and Asst Conductor *were*

8

**not in a position** to assist the Engineer or otherwise stop the movement prior to operating over the applied derail." APP 206 (emphasis added).

A second Incident Report prepared by Smith and also dated October 20, 2007, disclosed that Ebersole "dismounted to the east side while the locomotive was moving at slow speed." APP 207-208. The Incident Report is misleading because it fails to say that Ebersole dismounted on the side opposite that of Burley, that Burley did not see Ebersole leave the locomotive, that Ebersole did not tell Burley that he was leaving his post, and that Burley did not know (and could not have known) he was alone on the engine. By concealing facts known to Smith that would point to Ebersole as responsible for "not [being] in a position to assist the Engineer or otherwise stop the movement prior to operating over the applied derail," APP 206, the Incident Reports transfer blame to Burley.

Although Smith knew Ebersole should have directed the movement of the engine, Smith's Incident Reports principally blame Burley for the derailment and paint him as the more negligent crew member by stating he "took no action to stop the locomotive or otherwise positively determine the position of the derail." APP 208.

Smith was Chairman and one of three members of an Amtrak Incident Committee to investigate the accident, but none of the members of the committee

9

except Smith conducted any investigation. The other members merely signed Smith's report. APP 406-407, 412-415.

### C.    Outcome of Charges Against Ebersole and Burley

On October 25, 2007, Amtrak charged Ebersole and Burley with safety violations in separate documents signed by Zachary Pingley. APP 212, 327. Pingley, who reported to Smith, listed Smith as a "company witness" in both cases and sent him copies of the charges.

As a result, Burley was fired. Ebersole's punishment was suspension for a mere 15 days.

The "Specification of Charges" against Ebersole were more serious than those against Burley. Both Burley and Ebersole were charged with failure to stop for displayed blue signal [NORAD Rule 16(a)(3)] and for passing over derails "in derailing position." [NORAD Rule 104(d)]. Compare App 212-213 with APP with 326-327.

Ebersole was charged with failing to direct his crew or take positive action to prevent the derailment while he was "responsible for your crew and train movement." APP 326. Ebersole also was charged with violating an internal Amtrak rule that bars employees from jumping from a moving engine. APP 327. The Specification for this Charge 4 states: "[t]his action contributed to the derailment in that you were not in

10

the cab of the locomotive to notify your Engineer of the applied blue-signal in the derailing position, nor were you in position to take positive action to prevent your train movement from passing the blue signal derail in the derailing position." APP 327.

In addition to the two charges also leveled against Ebersole listed above, Burley was charged with exceeding restricted speed [NORAC Operating Rule 80] and violating general duties of an engineer to observe signals [NORAC Operating Rule 956]. APP 212-213.

Amtrak's union contracts contain a procedure called a "waiver," which is similar to a plea bargain in which a party acknowledges responsibility for his actions, waives his right to a formal hearing, pleads guilty to certain charges, and accepts an agreed upon punishment. APP 200-204 When an Amtrak employee signs a "waiver," Amtrak is not required to so advise the Department of Transportation of the discipline imposed.  APP 460.

Amtrak permitted Ebersole to sign a "waiver," equivalent to allowing him to plead to lesser charges. Ebersole admitted he violated NORAC Operating Rule 941 making conductors responsible for the operation of the train, and that he "failed to direct" his crew or "take positive action" to prevent the derailment." APP 323.

11

Burley's union representative sought such a "waiver" for Burley from Smith. The request went to Pingley, the charging officer appointed by Smith. The "waiver" Burley sought would admit responsibility for the derailment and accept to a penalty. APP 330-334, 445, 534-535.

Amtrak denied Burley's request for a "waiver" and insisted on bringing Burley's charges to a formal hearing. Amtrak has produced no admissible evidence concerning who made the decision to deny the "waiver" or any official reasons for the decision.[4] APP 279-280. Pingley has testified that he believes Smith made the decision to deny the "waiver." APP 446-448.

Superintendent of Operations, Mid-Atlantic Division Michael Sherlock testified he thought Smith would know why Ebersole was allowed to sign a "waiver" but Burley was not, since Smith was the supervisor. APP 188, 331-333.

## D.    Amtrak's Internal Disciplinary Proceedings

On November 15, 2007, Amtrak held a formal disciplinary hearing on Burley's charges before M.J. O'Connell, a Hearing Officer employed by Amtrak. Smith was the chief witness for the prosecution.

---

[4]     Amtrak asserts that the decision was made either by Pesce or Sherlock, but neither official has any recollection of involvement in the decision, and Amtrak has produced no other evidence in support. APP 41-43.

Not only did Smith testify as to facts, including facts about which he had no first hand knowledge[5], he also testified over objection as an expert on NORAC rules, APP 364-367, 372. The Hearing Officer based his decision in large part on Smith's expert testimony. APP 239-245.

The disciplinary hearing was unfair in part because Amtrak did not produce relevant documents until the morning of the hearing, and it never produced the two-page second incident report upon which Amtrak relied to decide the extent of the punishment. Burley and his representative was unaware of the existence of the second incident report. In part that document disclosed that damages from the incident were below the FRA's accident/incident reporting threshold, a significant mitigating factor that Burley's representative was unable to argue to the Hearing Officer or put in the record to be considered by the Amtrak manager who decided punishment.

The Hearing Officer denied Burley's request to raise the issues of the disparate treatment Ebersole received in the same accident and the grant of Ebersole's request for a "waiver" and denial of Burley's corresponding request. APP 355-356, 382

---

[5]     Even though Ebersole and Mahalak were available to testify for themselves, the Hearing Officer allowed extensive hearsay evidence from Smith about matters that the two conductors had first hand knowledge but about which Smith did not. That testimony was admitted over Burley's objections. APP 32-363.

13

(denying Edler, Burley's union representative, the opportunity to cross examine Ebersole on discipline taken against him). Thus, the hearing record does not contain evidence of disparate treatment of the lenient punishment given to Ebersole.

In his decision dated November 23, 2007, the Hearing Officer concluded that "the charges have been proven," relying primarily on the evidence provided by Smith. APP 241-245.

The hearing record went to Amtrak manager Daryl Pesce to decide discipline. It is undisputed that Pesce did not conduct an independent investigation, but rather relied solely on the record before him, including the Hearing Officer's decision, Burley's truncated testimony at the hearing in which he was not allowed to testify about the "waiver" process or his claims of disparate treatment, Smith's testimony at the hearing, and the two incident reports prepared by Smith. Based on information from Smith, Pesce concluded that Burley was solely at fault for the derailment. APP 282.

In meting out punishment, Amtrak failed to take into consideration mitigating circumstances, including Ebersole's primary role in the derailment which Smith did not disclose in the incident reports he prepared or his testimony, the absence of prior safety offenses, and that the damage from the derailment was below the FRA's accident/incident reporting threshold. APP 318.

14

Burley was fired and his license as a locomotive engineer was suspended.

### E.    The LERB Decision

Burley appealed the findings against him to the LERB, the only impartial body to consider all of the evidence.  LERB reversed because there was not "substantial evidence" to establish that the "blue signal was properly displayed" or grounds for revoking Burley's license.  APP 265-266.

The LERB noted Burley's contention that Amtrak "failed to make a good faith determination concerning the decertification charges" against Burley, noting that Burley "had depended on the conductor to be at the front of his locomotive looking for objects like an applied derail."  APP 265-266.

The LERB also considered Burley's contention that he had been "denied a fair and impartial hearing because Amtrak withheld relevant and probative evidence." Amtrak refused to provide Burley with the Amtrak Incident Report prior to the hearing which would have made clear that damages from the incident were below the FRA's accident/incident reporting threshold.  Amtrak never provided Burley with "surveillance video of the area, which may have verified critical details as to the proper display of the blue signal."  APP 263.

The LERB also considered Burley's contention that the hearing officer was not impartial in that he gave prejudicial latitude to the statements of Assistant Terminal

15

Superintendent Smith to show that blue signal protection had been properly displayed." APP 263.

The LERB also considered Burley's contention that he had been subjected to disparate discipline because he was the only crew member who was dismissed, even though the other crew members were charged concerning the derailment. APP 263.

### F.    Burley's Punishment Compared to Others

Amtrak has a track record of treating Caucasian engineers differently from African-American engineers. Amtrak has given token punishment to train engineers guilty of accidents for far more serious safety violations, including one by an engineer whose engine collided with a MARC train, causing grievous personal injuries. APP 649-698.

In another instance, Amtrak gave a token punishment to an Amtrak engineer who failed a drug test, an obviously intentional violation. A reasonable jury is not required to believe Amtrak's explanation for its harsher treatment of Burley. APP 649-698.

## SUMMARY OF THE ARGUMENT

Under railroad regulations, the conductor is in charge of the operation of the train and gives orders to the engineer. As a result of a minor train derailment, Amtrak fired Burley, an African-American engineer, and suspended his license, while Ebersole, a Caucasian conductor who caused the derailment by secretly abandoning his post without telling Burley, received only a fifteen-day suspension. A reasonable jury could see a parallel to a situation where a Deck Officer in the Navy directs a crew member to steer the ship so it will run aground, but secretly abandons the ship while the sailor continues to steer the ship pursuant to his prior instructions.

Burley presented evidence to prove three reasons why a reasonable jury could find pretext. The district court rejected all three reasons.

The district court ruled this is a "sincere belief" case governed by *Brady, supra*, and *Fischbach, supra.* In granting summary judgment to Amtrak, the district court misapplied this test and usurped the role of the jury by crediting evidence proffered by Amtrak, while ignoring, discrediting, and explaining away contrary evidence presented by Burley and denying Burley favorable inferences arising from the evidence.

The district court erred in ruling as a matter of law that the Court's analysis in *Staub, supra,* was not applicable to this case, where a reasonable jury could find that

17

Assistant Superintendent Smith was the real decision-maker. The district court erred in its analysis of evidence that the Blue Signal was undamaged and in finding that Smith had a "sincere belief" that the Blue Signal was properly displayed.

The district court erred in ruling as a matter of law that Amtrak satisfied the "sincere belief" standard. There are disputes of material fact as to whether Smith could have had a "sincere belief" about whether Burley was culpable for the derailment.

The district court erred in ruling as a matter of law that Amtrak satisfied the standards for investigating disciplinary offenses articulated in *Mastro, supra.* The district court failed to recognize there was a jury question as to whether Smith concealed the cause of the derailment and mitigating evidence, gave inaccurate or misleading testimony, and manipulated the investigation to blame Burley for the derailment and ensure Ebersole would only receive a short suspension.

The district court erred in ruling as a matter of law that Burley, an African-American engineer, and Ebersole, a Caucasian conductor, were not proper comparators under the circumstances present here, where the conductor was "in charge" of the "general management of the train" and was responsible for directing Burley's actions at the time of the derailment of the locomotive. The district court overlooked the most significant similarities between Burley and Ebersole, *i.e.*, that

18

they shared responsibility for the same derailment and were charged with largely identical safety offenses.

The district court erred in rejecting Burley's spoliation claims on evidentiary and procedural grounds.

The district court erred by engaging in improper fact finding and resolving disputes of material fact against Burley and denying Burley favorable inferences from the evidence in ruling that Burley failed to present sufficient evidence to convince a reasonable jury that he was denied a waiver for discriminatory reasons.

The district court erred in rejecting Burley's argument that Caucasian engineers who committed more serious safety violations provided sufficient evidence of race discrimination.

## ARGUMENT

### I. Standard of Appellate Review and Applicable Legal Principles

The standard of review for a grant of summary judgment is *de novo*. *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir 2010) (citation omitted).

In deciding a summary judgment motion, all evidence and inferences to be drawn must be considered in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "If material facts are at issue, or, though undisputed are susceptible to divergent

19

inferences, summary judgment is not available." *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). As the Supreme Court observed, "although the court should review the record as a whole, it ***must disregard*** all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000) (citation omitted) (emphasis added).

Summary judgment is ordinarily inappropriate when a defendant's intent and state of mind are placed in issue. *Robinson v. PPG Industries*, 23 F.3d 1159, 1162 (7th Cir. 1994) (standard for summary judgment is "applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues"); *Gordon v. Kidd*, 971 F.2d 1087, 1094 (4th Cir. 1992) ("Where states of mind are decisive as elements of a claim or defense, summary judgment ordinarily will not lie.") (citation omitted).

Plaintiff is entitled to have his "version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, the most favorable of possible alternate inferences from it drawn in his behalf; and finally to be given the benefit of all favorable legal theories invoked by the evidence so considered." *Charbonages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979).

"A plaintiff alleging employment discrimination need produce very little evidence in order to overcome an employer's motion for summary judgment. This

20

is because the ultimate question is one that can only be resolved through a searching inquiry — one that is most appropriately conducted by a factfinder, upon a full record." *Davis v. Team Elec Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (internal citations omitted).

"If the evidence presented on a dispositive issue is subject to conflicting interpretations, or reasonable persons might differ as to its significance, summary judgment is improper." *Greenberg v. Food & Drug Admin.*, 803 F.2d 1213, 1216 (D.C. Cir. 1986). "A jury may reasonably choose not to credit the Defendant's arguably flimsy explanation." *Daniels v. Tapella,* 571 F. Supp. 2d 137, 145 (D.D.C. 2008).

Under the law of the Circuit, the issue on appeal is: "has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race ...?" *Brady*, 520 F.3d at 494. The Court considers this question in light of the total circumstances of the case. The Court asks "whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff ... or any

21

contrary evidence that may be available to the employer.'" *Hamilton v. Geithner,* 666

F.3d 1344, 1351 (D.C. Cir. 2012) (quoting *Aka v. Washington Hospital Center,* 156

F.3d 1284, 1289, 1291 (D.C. Cir. 1998) *(en banc).*

## II.   A Reasonable Jury Could Decide Amtrak's Reasons for Terminating Burley Were Inaccurate, Misleading or Incomplete Because Smith Manipulated the Disciplinary Process

Burley argued that the fact that he was terminated on the basis of inaccurate,

misleading, or incomplete testimony demonstrated the pretextual nature of his

termination.

The district court ruled this a "sincere belief" case governed by *Brady* and

*Fischbach,* and that the issue before the court was whether Amtrak "sincerely

believed" Burley was "at fault for the derailment" and that Burley's action warranted

his termination.  APP 49-54.  As this Court held in *Brady,* the issue is whether the

employer's stated belief "is reasonable in light of the evidence."  520 F.3d at 495.

The district court erroneously expressed the view that Burley was challenging

Amtrak's business judgment. This is incorrect; Burley is challenging Smith's motives

and credibility.  *Laxton v. Gap, Inc.* 333 F.3d 572, 585 (5th Cir 2003); *Ash v. Tyson

Foods, Inc.*, 546 U.S. 454, 457 (court should consider whether employer's judgments

were actually misjudgments) (citations omitted); *Wexler v. White's Fine Furniture,*

22

317 F.3d 564, 576-577 (6th Cir. 2003) (*en banc*) (consideration of the
"*reasonableness of a business decision* is critical in determining whether the
proffered judgment was the employer's actual motivation) (emphasis added); *Smith
v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998) ("honest belief must be
"reasonably based on particularized facts rather than on ignorance and mythology");
*Beard v. Seagate Technology, Inc.*, 145 F.3d 1159, 1169 (10th Cir. 1998).

## A.   The District Court Erred in Identifying the Decision-Maker

The district court repeatedly used expressions like "Amtrak's beliefs" and
"sincerity of Amtrak's belief." APP 49-54.  But corporations act only through their
agents, and courts must focus on the actions, beliefs and motives of the employees
who actually made the decisions.  Because corporations do not have "stated beliefs,"
the disciplinary process must first be analyzed under *Staub*.

Under *Staub*, the court should focus on inferences to be drawn from Smith's
actions in determining whether Smith's beliefs were "reasonable in light of the
evidence," *Brady*, 520 F.3d at 495, or whether he could be found to be lying,
concealing or manipulating the evidence to ensure that Ebersole would be treated
leniently for his role in the derailment and Burley would be severely punished.  A
reasonable jury could find, based on all the evidence, that disputes of material fact
exist, and Smith distorted the evidence to blame Burley for the derailment.

23

In *Staub*, the Court rejected the employer's argument that the employer is not liable, unless the reporting supervisor who is the *de facto* decisionmaker is personally motivated by discriminatory animus. 131 S.Ct. at 1194. Accordingly, the district court's finding that neither Pesce nor Sherlock were aware of Burley's race at the time of their decision, APP 54, 55, n.11, is irrelevant to resolution of the primary issues raised on appeal.

As the Supreme Court ruled in *Staub*, "the exercise of judgment by the decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm." *Id.* Thus, the involvement of Sherlock or Pesce in the final stages of terminating Burley does not automatically render the link to Smith's bias and discriminatory and retaliatory animus "too remote" or "purely contingent." *Id.* As the Court ruled in *Staub*, the "decision-maker's exercise of judgment is *also* a proximate cause of the employment decision, but it is common for injuries to have multiple proximate causes." (emphasis in original) *Id.*, citing *Sosa v. Alvarez-Machain,* 542 U.S. 692, 704 (2004).

Nor can Sherlock's or Pesce's *ex post facto* explanations of their actions be deemed a superseding cause of the harm. "A cause can be thought 'superseding' only if it is a 'cause of independent origin that was not foreseeable.'" *Id.,* quoting *Exxon*

24

*Co., U.S.A. v. Sofec, Inc.,* 517 U.S. 830, 837 (1996). Here, of course, Smith's actions precipitating the process leading to Burley's termination was foreseeable because Smith testified that the Blue Signal was properly displayed and made it appear that Burley was solely responsible for the derailment. Smith concealed evidence of mitigating factors, including that Ebersole was granted a waiver.

The crux of Burley's argument focuses on Smith's conduct and his role in Amtrak's decision-making process. The "discriminatory information flow" began with Smith and influenced the decisions made downstream. *Sharp v. Aker Plant Services Group, Inc.,* 726 F.3d 789, 797 (6th Cir. 2013) (citations omitted). The evidence viewed in a light most favorable to Burley demonstrates that Smith knew exactly what happened prior to the derailment, knowledge that he suppressed when he created the inaccurate impression that the derailment was primarily Burley's fault.

A reasonable jury could find that Smith was Amtrak's real decision-maker, as defined in *Staub*, based on Smith's discussions and interviews with Ebersole and Burley and his preparation of the Incident Reports, his role in granting Ebersole and denying Burley a waiver, and his inaccurate or misleading testimony at Amtrak's disciplinary hearing held to determine whether to discipline Burley. Smith controlled all the relevant information relating to denying Burley the same waiver given to Ebersole. A reasonable jury could find that Amtrak is accountable for the bias Smith

25

harbored, even if others ultimately executed the termination. *Sharp, supra*, 726 F.3d at 797 (rejecting argument that supervisor was not the decision-maker because he made the recommendations, he was the only person who knew the employees in question and his recommendations were followed). Under *Staub*, a jury could find that Smith was Amtrak's decision-maker.

### B.    The District Court Erred in its Analysis of the Blue Signal

Overwhelming evidence exists in the record that the Blue Signal was not properly displayed, and Smith's testimony is the only evidence to the contrary. There is an ample evidentiary basis for a reasonable jury to conclude that Smith is incorrect about the Blue Signal being properly displayed because the error is "too obvious to be unintentional." *Fischbach*, 86 F.3d at 1183.

A reasonable jury could find that Smith could not have "sincerely believed" that Burley was primarily responsible for the derailment because, as the LERB found, there was *not* "substantial evidence" that the Blue Signal was displayed. Although Smith stated in the documents he prepared and in his testimony at Burley's disciplinary hearing that the Blue Signal was displayed, there are multiple related reasons why a jury is not required to accept his testimony and could find he did not sincerely believe the Blue Signal was displayed.

26

First, Smith was not present at the time of the derailment and he therefore lacked first-hand knowledge of whether the Blue Signal was properly displayed. Smith had to rely on circumstantial evidence to overcome Burley's testimony that the Blue Signal had been lowered.

But the circumstantial evidence suggests Smith was untruthful because there was no damage to the blue light that would have occurred if a locomotive had collided with it. APP 528-529. Smith in fact even testified that the blue light was blinking, something that would not have happened had a locomotive run over it. APP 366.

A reasonable jury could find that if the Blue Signal had been properly deployed before the derail, the impact of the locomotive striking the blue light would have destroyed the blue light and the light certainly would not have continued blinking. APP 427-428 ("Anything a locomotive hit is done. If a locomotive hit it, it's done. There ain't no fixing it."). APP 429. A jury could infer discriminatory animus and lack of Smith's credibility from the absence of damage to the blue light and flag.

Further, that the Blue Signal was found undamaged under the locomotive is consistent with Burley's testimony that the banner was lowered to its resting spot during the normal course of business and that Burley was authorized to proceed because the maintenance workers had completed their shift and no longer needed the

27

protection of the Blue Signal. That the blue light continued to blink makes it unreasonable to infer that it was displayed prior to the accident. The trial judge failed to consider the normal placement of the Blue Signal, which stands approximately eight to twelve inches above the tracks when properly displayed. When the Blue Signal is down, it rests between the rails and is lower than the top of the rails.

The trial judge credited Smith's testimony and engaged in improper fact-finding when he found "it was reasonable to infer that the Blue Signal ended up underneath the derailed engine because it was displayed over the track prior to the accident." APP 51. When the evidence is viewed in a light most favorable to Burley, it is *more* reasonable to infer that the undamaged Blue Signal was beneath the engine because it had been taken down after the workers left the area. Thus, the district court usurped the function of the jury by crediting Smith's unsupported testimony and failed to draw inferences in Burley's favor from the undisputed fact that the Blue Signal was undamaged and Smith was testifying that the light was blinking after the accident. *Pardo-Kronemann*. 601 F.3d at 604-605.

Third, the district court erred in overlooking the probative value of the LERB decision. A reasonable jury could consider the LERB decision and decide that there was not "substantial evidence" that the Blue Signal was displayed during the time of the derailment. The jury is not bound by Smith's conclusory assertions and could

28

find that Smith could not have "sincerely believed" that Burley was solely responsible for the derailment in the face of an undamaged Blue Signal, The LERB found there was not "substantial evidence" to support Smith's testimony precisely because it was *not* "reasonable to infer that the Blue Signal" was "displayed over the track prior to the accident." APP 51.

Fourth, Smith claims to have conducted an investigation of the derailment. But he deliberately chose not to review [or rely on] the security camera video of the incident. Smith's failure to review the video was an issue at Burley's disciplinary hearing. The union requested Amtrak's surveillance video of the area. Amtrak refused to provide the video and destroyed it prior to the hearing. APP 332, 393, 529 *See* APP 421-426 (Smith "would have definitely looked at the tapes. Those are the guys that made decisions.").

The district court erred in ruling that "the only evidence that a videotape even existed is hearsay" for several reasons. APP 52. The statement made to Elder by Runkles, the Amtrak employee charged with monitoring Amtrak's recording equipment, is admissible under FRE 801(d)(2)(D) as an opposing party's statement.

The district court's observation that Runkles' statement is "the only evidence that the videotape even existed" is also incorrect. Edler, Burley's union

29

representative, requested the video prior to Burley's disciplinary hearing and Amtrak's refusal to produce the video was an issue at the hearing.  APP 330.

Even if this court were to determine that Runkles' statement to Edler about the video is inadmissible under FRE 801(d)(2)(D), the court nevertheless erred in failing to take the statement into consideration on summary judgment.  *Gleklen v. Democratic Campaign Committee*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) ("While a nonmovant is not required to produce evidence in a *form* that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence.") Burley could overcome any issue regarding admissibility at trial by presenting live testimony from Runkles. A reasonable jury could find that any belief by Smith that the Blue Signal was displayed was not reasonable when he failed to review the video as part of his investigation.

### C.    The District Court Misapplied *Brady* and *Fischbach*

The district court misapplied *Brady* and *Fischbach* in several respects. Whether the Blue Signal was properly displayed, there is no real credibility dispute as to what happened to cause the derailment.  Smith, the decision-maker, had all of the information when he prepared his Incident Report and when he testified at Burley's disciplinary hearing. Smith could not have "sincerely believed" that Burley was more

30

culpable than Ebersole, whom he knew deserted his lookout position on the locomotive without telling Burley.

Under *Brady,* Burley is entitled to show that Smith's [and Amtrak's] stated belief is not "reasonable" in light of the lack of damage to the Blue Signal and Smith's apparent failure to review the videotape of the accident. Smith's "error" was "too obvious to be unintentional" *Fischbach,* 86 F.3d at 1183.

The district court erred in its analysis of the October 20 Incident Report. APP 56-58. A reasonable jury could find that the Incident Report omitted key information favorable to Burley, including that Ebersole abandoned his position and jumped off the train *without telling Burley he was going to do so.* The district court erred in its reading of the Report because, contrary to the court's opinion, APP 57, Ebersole's failure to let Burley know that Ebersole left the train is missing from the Incident Report. APP 57, 206-208. The district court failed to draw inferences in Burley's favor, as it was required to do.

The Report states that the "cause" of the accident was Burley's failure to "stop for an applied blue-flag derail." This is misleading in the absence of the additional fact that Burley failed to stop because he did not know Ebersole abandoned his position on the front of the locomotive without telling Burley. The Report states that Ebersole was "not in a position to assist [Burley] or otherwise stop the movement

31

prior to operating over the applied derail," APP 206-208, but it fails to state that Burley could not have known Ebersole left the train or explain why Ebersole could not prevent the derailment, *i.e.*, because he had abandoned his position ***without telling Burley.***

A reasonable jury could find that since Smith inaccurately testified that the Incident Report reflected "the available evidence," Tr. at 40, the jury is not required to believe any of Smith's testimony. A reasonable jury could find Smith's testimony was inaccurate because Smith knew precisely why Ebersole was "not in a position to assist the engineer." Ebersole's guilty plea contained in his waiver said as much. APP 323. Smith concealed the mitigating circumstances as to Ebersole both in the Incident Report and in his oral testimony at the hearing. APP 40-41, 206-208, 356, 365.

The district court also engaged in improper fact finding in assessing Amtrak's alleged belief that "Burley's conduct warranted denial of his request for waiver." APP 50, 53. A reasonable jury could find that Burley's request for a waiver and his willingness to plead guilty made the issue of whether the Blue Signal was properly displayed irrelevant. A reasonable jury could find that Amtrak could not have reasonably believed Burley's conduct, when considered in its entirety with all of the mitigating circumstances, "warranted denial of his request for waiver."

32

The court also erred in considering and relying on the *ex post facto* opinion testimony from Amtrak's witnesses. Amtrak admits that it does not know who made the waiver decision. APP 41-43. Further, testimony as to what Pesce and Sherlock "would" have done five years earlier is speculation with no probative value. Therefore it is inadmissible on summary judgment or at trial. *Evans v. Sebelius*, 716 F.3d 617, 622-623 (D.C. Cir. 2013) (reversing entry of summary judgment in part because of agency's inability to identify person who took the adverse action in cancelling the position); *Cuddy v. Carmen*, 762 F.2d 119, 127, n.12 (D.C. Cir. 1985) ("Allowing an employer to meet its *McDonnell-Burdine* burden by testifying to *possible* legitimate reasons for employment decisions, whether or not those reasons were the actual motivation behind the disputed decisions, would clearly circumvent the purpose of the burden shifting scheme.") (citations omitted) (emphasis added).

The district court further erred in accepting Pesce's speculation in Defendant's Statement of Material Facts ("SMF") ¶45, APP 280, as conclusive. A jury is not required to credit such testimony, even if it were admissible. *See* APP 42, 295.

Nor is a jury required to agree that there is a connection between the denial of a waiver and the necessity of a formal hearing to resolve whether the Blue Signal was actually displayed during the derailment. Moreover, as we show below, there is no reason to believe that Burley was charged with safety violations any more serious

than those with which Ebersole was charged. A reasonable jury could find that Burley was denied a waiver because Smith gave inaccurate, misleading or incomplete testimony on whether the Blue Signal was properly displayed, manipulated the evidence, hid evidence of mitigating factors, to make it inaccurately appear that the derailment was primarily Burley's fault.

The district court further erred in accepting Sherlock's speculation about why he would not have given Burley a waiver. APP 41-45. A reasonable jury is not required to accept Sherlock's *ex post facto* opinion as true. First, Sherlock stated that he would have relied on the "findings of the Incident Committee," which were, as a result of Smith's actions discussed above, misleading and incomplete. That Sherlock would have relied on Smith for information supports Burley's contention that Smith was the real decision-maker. *Sharp, supra,* 726 F.3d at 797.

Second, Sherlock's statement that Burley "declined to accept responsibility for the accident" lacks an evidentiary foundation and is untrue. A reasonable jury could find that Burley's request for a waiver demonstrates that he accepted "responsibility" for the derailment.

The district court also engaged in improper fact-finding in analyzing the issue of excessive punishment by focusing on Pesce. APP 44, 54. Pesce believed that "Burley was solely at fault for the derailment" precisely because Smith concealed

34

mitigating information about Ebersole's primary responsibility for the derailment. Pesce was also swayed by Smith's testimony that the Blue Signal was properly displayed, contrary to the inferences that would be drawn from the available circumstantial evidence. As a result of Smith's actions, Pesce was unaware of mitigating circumstances or that Ebersole had been granted a waiver. *See* APP 457-459. A reasonable jury could find Pesce terminated Burley based on the information that Smith either withheld or manipulated.

Since under *Staub*, the issue of the "sincerity of Amtrak's belief" must be examined in light of Smith's belief, this court should rule there are disputes of material fact. We submit that a reasonable jury could find that Smith's "belief" was not "sincere." A reasonable jury could find that Smith set into motion the entire course of events, that he was the actual decision-maker, and that Smith concealed Ebersole's role in the derailment from Pesce to ensure that only Burley would be severely punished for the derailment.

The district court erred in overlooking evidence that Smith manipulated the entire disciplinary process by omitting key facts from the Incident Report and by his later testimony, particularly the reason Ebersole was not in a position to warn Burley about the derail and that Burley did not know Ebersole had abandoned his post at the front of the engine. Smith allowed Ebersole a waiver and a reduced penalty, even

35

though he knew exactly what happened prior to the derailment, as evidenced by the charges levied against Ebersole and Ebersole's guilty plea in the waiver. APP 41-43.

At the same time, Smith denied Burley a waiver, even though Smith knew that Ebersole was at least as responsible for the derailment as Burley. We respectfully submit that a reasonable jury could find he did so for discriminatory reasons.

### III.    A Reasonable Jury Could Infer Pretext from Amtrak's "Investigation"

Relying on *Mastro*, 447 F.3d at 856, Burley also sought to show Smith's investigation was so flawed that a jury could infer "that discriminatory treatment may have permeated the investigation itself." The district court rejected Burley's arguments on the ground that "no reasonable jury could infer that Mr. Smith acted with discriminatory motivations." APP 56, n. 12. The trial court erred in failing to consider Smith's central role throughout the entire disciplinary process. A reasonable jury could find that Smith's investigation, which was central to and culminated in Burley's termination "was not just flawed but inexplicably unfair," *See Mastro*, 447 F.3d at 855.

Smith's "investigation" lacked "the careful, systematic assessment of the evidence and the credibility of the witnesses that "one would expect in an inquiry on which [Burley's] reputation and livelihood depended." *Id*. For example, Amtrak relied heavily on the documents prepared by Smith, who manipulated the entire

disciplinary process. A reasonable jury could find Smith's credibility questionable in light of his insistence that the undamaged Blue Signal had been properly displayed. A reasonable jury could find Smith's omissions suspect, particularly in light of his failure to address that Ebersole abandoned his position and jumped off the train without telling Burley, why Smith concealed Ebersole's violation of NORAC and Amtrak rules and regulations and evidence of mitigating factors showing Burley was not primarily to blame for the derailment APP 57, 309-311.

Smith manipulated the outcome of the investigation because he concealed what he knew about Ebersole's greater culpability and gave Ebersole a waiver, an option denied to Burley. "A jury might find it curious," to use the idiom of *Mastro*, 447 F.3d at 856, that Smith never bothered to include in his reports any explanation why Ebersole was "not in a position to assist" Burley. "A jury might find it curious" that Smith failed to mention that the cause of the accident was Ebersole's abandoning his position on the leading edge of the locomotive without telling Burley. "A jury might find it curious" that Smith's reports contained no mention of the mitigating circumstances surrounding the derailment, including Ebersole's admission of culpability. APP 309-311, 323-327.

"A jury might find it curious" that Smith allowed Ebersole a waiver to escape serious punishment, but denied Burley that option. "A jury might find it curious" that

37

Smith testified that the undamaged Blue Signal was properly displayed when he was not present at the time of the derailment and the Blue Signal would not have been undamaged had the locomotive collided with it.

The district court engaged in improper fact-finding in analyzing the Incident Report and drew its inferences in favor of Amtrak. In particular, the district court improperly sought to explain away the omissions in the incident Report. APP 57. A reasonable jury could find that the real cause of the derailment was that Ebersole abandoned his position without telling Burley.

The district court sought to distinguish the investigation this court addressed in *Mastro* on the grounds that the investigation in *Mastro* "turned on the relative credibility of witnesses whose testimony contradicted that of the plaintiff." APP 57, citing *Mastro*. But the investigation of the derailment in this litigation also turns on the relative credibility of Smith who claimed the Blue Signal was properly deployed during the derailment and those witnesses who testified that the Blue Single was not up.

Smith's credibility is subject to attack not just because other witnesses testified to contrary facts, but also because the physical evidence contradicts that the Blue Signal was displayed. The district court improperly engaged in fact-finding when it stated that "Mr. Smith based his findings on physical evidence of what was found

38

after the accident." APP 58. The district court's fact finding is also reversible error because Smith testified that the blue light was still blinking after the accident, and the LERB found there was not "substantial evidence" to support Smith's testimony.

The district court further sought to distinguish this case from *Mastro* by finding that the witnesses in *Mastro* "all had strong motive to lie." APP 58, citing *Mastro*. In this case a reasonable jury, looking at all of the evidence, could find that Smith must have had an equally "strong motive to lie."

A reasonable jury could find that the omissions in the Incident Reports were intentionally misleading and that Smith crafted the report to place all of the blame for the derailment on Burley, while concealing the charges against Ebersole.

A reasonable jury could also find there was no real "investigation" and no further efforts to determine culpability and the identity of person(s) who were responsible for the accident. No one questioned Smith's statements in the Incident Report or asked why the conductors were "not in a position to assist the Engineer."

In assessing the quality of the investigation, a reasonable jury could also find that Smith never reviewed the video of the derailment and could consider Smith's failure to review the video in assessing whether Amtrak's investigation met the *Mastro* standard. Smith's failure to review the video of the derailment is relevant to assessing whether the investigation meets the *Mastro* standard, an issue distinct from

39

Burley's spoliation argument discussed below. A reasonable jury could find Smith already decided to blame Burley and did not want to find evidence to the contrary. A reasonable jury could also infer that Smith knew the videotape contradicted his testimony.

The district court distinguished *Mastro* on the grounds that "Mr. Smith's investigation was reviewed by formal procedures . . ." APP 58. A reasonable jury could find the evidentiary hearing a travesty. Amtrak's Hearing Officer refused to allow Burley's union representative to cross-examine Ebersole regarding the charges leveled against him for his role in the derailment. APP 382. A reasonable jury could find a denial of due process in that the two-page report prepared by the Incident Committee, APP 40, 41, 60, was not produced for the November 15, 2007 Hearing.[6]

Amtrak's Hearing Officer, over the union's objections, allowed Smith to provide extensive hearsay testimony, purporting to represent the testimony of Ebersole and Mahalak, even though the actual supposed sources of this "evidence"

---

[6]    Amtrak subsequently relied on that Report to justify its termination decision without giving Burley an opportunity to respond to the allegations in and omissions from that document. In fact, no reference appears in the hearing record to two-page report prepared by Incident Committee. APP 207-208. Burley never saw the Committee's Incident Report until it was produced in discovery. APP 334, 527.

40

were available to testify themselves.  Smith was allowed to testify about matters that he did not, and could not, know about.  APP 362-363.

The Hearing Examiner rejected the union's objection to the admission of Smith's Incident Reports.  APP 360.

Amtrak's Hearing Examiner relied primarily on Smith, who inaccurately testified that the derail was properly "applied" at the time of the derailment.  Since Smith was not present during the derailment, there is no way he could know whether the derail was properly "applied" during the derailment.

The Hearing Officer, over the union's objections, allowed Smith to testify as an "expert" on NORAC rules without an evidentiary foundation for his qualifications. APP 364-367, 372.  Then the Hearing Officer based his decision on Smith's expert testimony.  APP 241-244.

The union requested Amtrak's surveillance video of the area.  Amtrak refused to provide the video and destroyed it prior to the hearing.  APP 332, 393, 529.  See APP 421-425 (Smith "would have definitely looked at the tapes.  Those are the guys that made decisions.").

A reasonable jury could decide that Smith was the actual decision-maker who concealed vital information necessary to reach a fair decision by the Hearing Examiner, manipulated the process and gave inaccurate testimony at the hearing.  A

41

reasonable jury could find that Smith could not reasonably have believed that Burley was solely at fault in the derailment and that the Hearing Officer's decision lacks credibility. APP 322-329. Under *Mastro*, a reasonable jury could reject Amtrak's claims that the "investigation was a reasonably objective assessment of the circumstances," *Mastro*, 447 F.3d at 857.

We respectfully submit that a reasonable jury could find Amtrak's investigation was pretextual which would support a finding that Smith caused Burley's termination for discriminatory reasons and to cover-up his preferential treatment of Ebersole. A reasonable jury could also conclude that the hearing was so flawed that its findings, based upon Smith's testimony, is further evidence of pretext.

## IV. The District Court Erred in Ruling Ebersole Was Not a Proper Comparator

Burley sought to show pretext by comparing his punishment with that of Ebersole who was at least as responsible for the derailment.  The district court rejected Burley's contention that Ebersole was a proper comparator.  As we show below, this was error for several reasons.

### A.    The Law Governing Comparators

The Supreme Court has cautioned that "precise equivalence . . . between employees is not the ultimate question." *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 283 n.11 (1976).  The touchstone of the similarly-situated inquiry is simply whether the employees are "comparable." *Id.*, quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973).

Burley need only "produc[e] evidence suggesting that the employer treated other employees of a different race ... more favorably *in the same factual circumstances.*" *Brady,* 520 F.3d at 495 (emphasis added). In this Circuit, comparators must have been "charged with offenses of comparable seriousness" and "all of the relevant aspects of [their] employment situation[s] [must have been] nearly identical." *Holbrook v. Reno,* 196 F.3d 255, 261 (D.C. Cir. 1999) (quoting *Neuren v. Adduce, Mastriani, Meeks & Schill,* 43 F.3d 1507, 1514 (D.C. Cir. 1995)).

43

"Whether two employees are similarly situated ordinarily presents a question of fact for the jury." *George v. Leavitt,* 407 F.3d 405, 414–15 (D.C. Cir. 2005), (citation omitted).  As this court has explained, whether employees are similarly situated turns on whether they are "in nearly all respects material" to the employer's explanation of the termination decision. *Barnett v. PA Consulting Group, Inc.*, 715 F.3d 354, 359 (D.C. Cir. 2013) ("The most significant differences between the two are that Gao is male and younger than Barnett. Those are differences a jury should be allowed to consider.") (reversing entry of summary judgment).

The Seventh Circuit "noted with some concern" the tendency of judges in employment discrimination cases "to require closer and closer comparability between the plaintiff and the members of the comparison group." *Coleman v. Donahoe*, 667 F.3d 835, 841, 851-852 (7th Cir. 2012) (citation omitted).  The purpose of the similarly-situated requirement is to "provide plaintiffs the 'boost' that the *McDonnell Douglas* framework intended." *Id.* at 852.  "Demanding nearly identical comparators can transform this evidentiary 'boost' into an insurmountable hurdle." *Id.*

The Seventh Circuit noted scholarly criticism of this phenomenon demanding nearly identical comparators, citing Suzanne B. Goldberg, *Discrimination by Comparison*, 120 Yale. L.J. 728, 734 (2011) ("The judicial demand for comparators continues largely unabated . . . , sharply narrowing both the possibility of success for

44

individual litigants and, more generally, the very meaning of discrimination."); Charles A. Sullivan, *The Phoenix from the Ash: Proving Discrimination by Comparators*, 60 Ala. L. Rev. 191, 216 (2009) (criticizing the tendency of courts "to require the comparator to be the almost-twin of the plaintiff before the comparison is sufficiently probative"); Ernest F. Lidge III, *The Courts' Misuse of the Similarly Situated Concept in Employment Discrimination Law*, 67 Mo. L. Rev. 831, 832 (2002). *Coleman*, at 857, n. 5.

The similarly-situated inquiry is flexible, common-sense, and factual. It asks "essentially, are there enough common features between the individuals to allow a meaningful comparison?" Coleman, 667 F.3d at 841, 847 (citation omitted) (reversing grant of summary judgment because district court's "analysis focused too much on minor differences and was too demanding for purposes of summary judgment). Similarly situated employees "must be 'directly comparable' to the plaintiff 'in all material respects,'" but they need not be identical in every conceivable way. *Id.* at 846 (citation omitted).

The fact that conductors had "different titles and duties do not defeat, as a matter of law, the probative value of their different disciplinary treatment." *Coleman*, 667 F.3d at 849; *Rodgers v. White*, 657 F.3d 511, 512, 518 (7th Cir. 2011) (plaintiff and his supervisor were accused of making similar mistakes, were equally responsible

45

for avoiding those mistakes, and were disciplined by the same superior; a jury could

infer plaintiff and his supervisors were proper comparators) (citations omitted).

Formal job titles and rank are not dispositive; an employer cannot "insulate itself

from claims of racial discrimination" by making formalistic distinctions between

employees. *Rodgers,* 657 F.3d at 518.  *See Miller-El v. Dretke,* 545 U.S. 231, 247,

n. 6 (2005) ("None of our cases announces a rule that no comparison is probative

unless the situation of the individuals compared is identical in all respects, and there

is no reason to accept one.") (claim under *Batson v. Kentucky,* 476 U.S. 79 (1986).

Here, Ebersole was subject to the same standards of conduct as Burley, set

forth in the NORAC rules.  Since the purpose of the NORAC rules is to ensure a "safe

. . . working environment," there is "no objective reason for it to apply with greater

or lesser force to employees of certain positions." *Coleman* at 849.  Comparators are

required only to have "engaged in similar -- not identical -- conduct to qualify as

similarly situated." *Id.*  In the absence of a legitimate business reason for applying

a double standard, this Court should find that the district court erred in failing to

recognize a jury could find the standards of conduct applicable to Burley and

Ebersole are identical.

## B.     The Identity of the Decision-Maker

The district court further erred in ruling that "there is no evidence that Mr. Ebersole was disciplined by Mr. Smith, Mr. Pesce, or Mr. Sherlock." APP 60.   As shown above, there are disputes of material fact on the extent to which Smith's "investigation" and testimony influenced the ultimate decisionmakers within the meaning of the Supreme Court's decision in *Staub*.[7]   Smith was fully informed of key facts surrounding the derailment, but he wrote the Incident Report in such a manner as to make it appear that the derailment was Burley's fault and not Ebersole's.  Under Amtrak's disciplinary procedures, both Smith and his subordinate Pingley were involved in the waiver process for Ebersole and Burley.  Further, Smith's testimony at the evidentiary hearing led to Pesce's understanding that Burley was solely at fault, and to Amtrak's decision to terminate Burley.

As analysis of the decision-making process is controlled by *Staub*. a reasonable jury could find that Smith was the key decision-maker.  Thus, the district court erred in drawing inferences against Burley and ruling as a matter of law that different supervisors were involved in the disciplinary process.  There is sufficient evidence of pretext for a reasonable jury to find that Smith acted with a discriminatory motive,

---

[7]     Burley does not argue that Pesce or Sherlock were the decision makers on the denial of his request for a waiver.

47

particularly because of the absence of any legitimate business reason to punish Burley more severely than Ebersole.

**C.     There are Disputes of Material Fact as to Whether Ebersole is an Appropriate Comparator**

There are sufficient factual similarities between Burley and Ebersole for the issue to be decided by a jury. Burley and Ebersole were both charged with Blue Signal violations and with violation of NORAC Rule 104(d) which forbids "pass[ing] over derails in derailing position." APP 326-327. Ebersole is a proper comparator because both he and Burley were involved in the same derailment and were charged with similar offenses; in fact, two of the offenses were identical. Ebersole was ***charged*** with violating NORAC Operating Rule 941, which states that Ebersole had "general charge of the train" during the derailment, thereby making him an appropriate comparator because he was a supervisor under NORAC Operating Rule 941. Ebersole was supposed to be directing the move. APP 41, 26-208.

Burley and Ebersole were "similarly situated" because they were ***charged*** with offenses of "comparable seriousness," *Holbrook v. Reno*, 196 F.3d at 261 (citation omitted). Here, a reasonable jury could find that Burley and Ebersole were charged with responsibility for the same derailment, thereby satisfying the requirement that

48

the offenses were of "comparable seriousness." There is no requirement that the comparators engage in identical conduct to qualify as "similarly situated."

### D.    Improper Fact-Finding in Analyzing Conduct and Responsibilities

In addition to the legal error of failing to follow the law of comparators discussed above, the district court engaged in improper fact finding on the specifics of the comparator issue.

### 1.    Finding Presence on the Locomotive Was Material

The district court found material that "Mr. Burley was present on the engine and Mr. Ebersole was not." APP 60. This distinction does not detract from Ebersole's value as a comparator because a reasonable jury could find that Ebersole's job was to be on the engine and he abandoned his post without notifying Burley, thus causing the derailment. Certainly, the facts do not justify imposing a more severe punishment on Burley.

The district court relied for its materiality holding on a finding by the Incident Committee, which in turn is based on Amtrak's unsupported contention that the Committee actually conducted a real "investigation" of the derailment.

A reasonable jury could find based on largely undisputed evidence that Smith prepared the Incident Report and the other members of the Committee merely signed off on the document prepared by Smith. APP 413. A reasonable jury could find no

49

real investigation by the Committee, and its members other than Smith did not speak with anyone involved in the derailment, had no personal knowledge about it and did not know of Ebersole's primary responsibility for causing the derailment. APP 406-407, 413-417.

A reasonable jury could find that Smith prepared the Incident Report without any input from the other members of the committee and that he slanted the contents and concealed information about Ebersole's role. A reasonable jury is not required to believe the "findings" in the Incident Report. It could find that Ebersole was at least as culpable as Burley and that Smith intentionally misstated the cause of the derailment for discriminatory reasons and omitted evidence of mitigating factors to cover-up preferential treatment of Ebersole.

A reasonable jury could also find that Smith manipulated the report of the Incident Committee by concealing *why* Ebersole was "not in a position to assist the engineer or otherwise stop the movement prior to operating over the applied derail."

The district court relied heavily on Amtrak's *ex post facto* explanation in Defendant's SMF ¶46. APP 42, 43, 280. Burley asserts that their opinions are entitled to no evidentiary weight for reasons articulated above. Neither can testify about the comparative discipline because as the district court noted, there is no

50

evidence that Ebersole was disciplined by Pesce or Sherlock, and Ebersole received a waiver. APP 60.

Under these circumstances, a reasonable jury is not required to believe the conclusory opinions of Sherlock and Pesce first offered in the middle of litigation. Smith controlled their knowledge of the circumstances of the derailment, and neither Pesce nor Sherlock made the decision to impose disparate discipline. Even if their statements were admissible at trial, a reasonable jury is not required to believe their evidence because neither claims to be the decision-maker.

### 2.    Finding of Material Differences in Responsibilities

The district court also erred as matter of law in rejecting Ebersole as a comparator because "material differences" in their responsibilities make Burley and Ebersole "improper comparators." APP 60.   These alleged differences were not material where Ebersole and Burley worked together as a team, shared responsibility for the same derailment, were subject to the same NORAC and Amtrak safety rules and regulations that Ebersole admitted to violating. APP 41, 415; *Coleman* at 857 ("Where a proposed comparator violated the same rule as the plaintiff in an equivalent or more serious manner, courts should not demand strict factual parallels.") (citation omitted).

51

### 3.    At Least Equal Culpability of Ebersole

The district court trivialized Burley's arguments that Ebersole is at least equally culpable by using the language: "Mr. Burley opines." APP 61. The court's analysis denies factual significance to Ebersole's exiting a moving train, failing to alert Burley to his departure, and abandoning his position on the leading end of the engine. APP 61. Burley's argument is based not on his unsupported opinion, but on hard evidence, NORAC Rules 116, 941, the instructions Burley received from Amtrak, and documents relating to Ebersole's waiver. APP 167, 323, 336-337, 458-459, 479-480, 517. A reasonable jury, considering mitigating circumstances, could find Ebersole at least as culpable as Burley and not deserving a lesser penalty.

The district court found Ebersole's action in jumping off the engine, "only renders their conduct more distinct." APP 61. The district court said: "Amtrak provided *evidence* that physical presence on a train is a key factor in deciding an employee's culpability for an ensuing accident and Mr. Burley provided no evidence to contradict this." *See* Def.'s SMF ¶ 46." APP 61, 280 (emphasis added). This statement was improper fact-finding on summary judgment because the district court accepted as true and conclusive opinions of Sherlock and Pesce formulated during litigation more than five years after the derailment about a disciplinary process in which they did not participate. The district court further erred in stating in circular

52

fashion that "it is not the role of this Court to disagree with the defendant's conclusion about the relative seriousness of Plaintiff's misconduct versus [a comparator's] alleged rules infractions." APP 60-61. Such deference to "the defendant's conclusion" is not warranted where both disclaimed any role in the decision-making process.

A reasonable jury could see a parallel to a situation where a Deck Officer in the Navy directs a crew member to steer the ship so it will run aground, but secretly abandons the ship while the sailor continues to steer the ship pursuant to his prior instructions. A reasonable jury could find that if Ebersole had not abandoned his position at the leading edge of the locomotive without notifying Burley, he could have alerted Burley that the derail was up. Under the circumstances, a reasonable jury could find that where Burley proceeded under Ebersole's previous instructions that Burley was not more culpable than Ebersole. APP 510-519.

### 4.    Misplaced Reliance on *Phillips v. Holladay Prop. Servs.*

In its analysis, the district court relied on *Phillips v. Holladay Prop. Servs.,* 937 F.Supp. 32, 37 (D.D.C.1996), a case that does not correctly state the law, and ruled that culpability for the derailment was a "personnel determination" that was immune from jury scrutiny." APP 61. The analysis in *Phillips* predates this court's decision in *George v. Leavitt, supra*, 407 F.3d 414–15, holding that the determination of

53

whether two employees "are similarly situated ordinarily presents a question of fact for the jury."

*Phillips* is also inconsistent with this Court's analysis in *Barnett*, 715 F.3d at 359. In *Barnett*, this Court carefully examined all the evidence to determine whether the lack of "fit" was the real reason for plaintiff's termination. The *Barnett* Court refused to be bound by the employer's conclusory explanation and reversed, ruling the conflicting evidence about the real reason for the termination was for the jury to decide. This Court should do the same in this case. *Philbrick v. Holder*, ___ Fed.App'x ___, 2014 WL. 4627704 (6th Cir. September 16, 2014) ("the court will not blindly accept an employer's alleged business judgment in the face of a claim of discrimination"), citing *Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 576 (6th Cir.2003); *Radentz v. Marion County*, 640 F.3d 754, 757-761 (7th Cir. 2011) (employer's unreasonably unbusinesslike approach was evidence from which a reasonable jury could find employer did not honestly believe the proffered reason).

Further, the district court deferred to Smith's determination of culpability for the derailment as a "personnel determination," APP 61, and, indeed, the very choice of this phrase constitutes improper fact finding. When the evidence is viewed in a light most favorable to Burley, a reasonable jury could find there was no neutral "personnel determination" and that Smith acted for discriminatory reasons in rigging

54

the entire process to ensure that Burley would be terminated and Ebersole would escape serious punishment.

The district court erred in ruling as a matter of law that Ebersole was not a proper comparator and that he was required to accept as conclusive the reasons first advanced by Amtrak's witnesses five years after the derailment. The district court erred in finding facts, and drawing inferences in favor of Amtrak. *Pardo-Kronemann*, 601 F.3d at 604.

The district court erred in failing to recognize disputes of material fact on the comparator issue that must be resolved by the jury. A reasonable jury could find that Ebersole's offenses were of "comparable" seriousness and that Smith treated Ebersole more favorably because of his race and/or that Burley was treated more harshly because of his race. Since the district's court's analysis of the evidence was affected by these legal errors, and because a reasonable jury could find that Ebersole and Burley were proper comparators, a reasonable jury could find the reasons advanced by Amtrak are pretextual. Accordingly, this Court should reverse and remand for trial.

## V.     The District Court Erred in Analyzing the Spoliation Issue

Where there is ample evidence of record as to the existence of the videotape, including testimony from Campbell that Smith would have reviewed the video, APP

55

421-426, the district court erred in rejecting Burley's claims for an inference of spoliation, particularly since the video likely would have conclusively demonstrated that the Blue Signal was not properly displayed at the time of the derailment. If the jury could find that Amtrak "destroyed potentially relevant evidence," *Gerlich v. U.S. Dep't of Justice,* 711 F.3d 161, 170 (D.C. Cir. 2013), the district court should have granted Burley a negative inference of spoliation. A reasonable jury could also draw an inference from Amtrak's destruction of the videotape of the accident that neither Amtrak nor Smith "sincerely believed" that the Blue Signal was properly displayed and that the video was destroyed to assist the cover-up.  *Id.*

## VI.  A Reasonable Jury Could Find Burley Was Denied a Waiver for Discriminatory Reasons

Discrimination may be inferred from *prima facie* proof and the fact-finder's disbelief of the proffered explanation--particularly if accompanied by a suspicion of mendacity.  *Hicks v St. Mary's Honor Center*, 509 U.S. 502, 511 (1993).  "No additional proof of discrimination is required."  *Id.*  Weaknesses, implausibilities, inconsistencies, incoherence or contradictions can show pretext.  An employer who fabricates an inaccurate explanation may be hiding a discriminatory intent. *Cones v. Shalala*, 199 F.3d 512, 519 (D.C. Cir. 2000).  Moreover, evidence of pretext is

usually sufficient "to get a plaintiff's claim to a jury." *Pardo-Kronemann*, 601 F.3d at 604 (citation omitted).

Amtrak has no admissible evidence explaining why the employer denied Burley a waiver. Amtrak's legal position is that the decision was made either by Sherlock or Pesce. But neither official recalls being involved in the decision. APP 279-280.

A reasonable jury could find in Burley's favor on each of the pretext issues on which he relies. A reasonable jury could find that Smith manipulated the evidence and withheld mitigating evidence favorable to Burley, and that there was no real "investigation" of the derailment.

A reasonable jury could find that Ebersole was a proper comparator and that Amtrak failed to provide any legitimate business reason or nondiscriminatory explanation for why he was granted a waiver and Burley was not. Sufficient evidence for Burley's claims of discrimination exist to go to trial. *Tolan v. Cotton*, 574 U.S. ___, 134 S. Ct. 1981, 1867-1868 (2014) ("Considered together, these facts lead to the inescapable conclusion that the court below credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion.); *Porter v. Shah*, 606 F.3d 809, 816 (D.C. Cir. 2010)

examining the totality of the circumstances to determine whether the agency's explanation is 'unworthy of belief").

## VII. Alternatively, A Jury Could Find Liability Because Caucasian Engineers Terminated by Pesce and Sherlock were Treated More Favorably Than Burley

Alternatively, Burley argued that he was disciplined more severely than other engineers because of his race and there is a jury question as to pretext.[8]

### A.     Engineers Disciplined by Pesce

Pesce, who Amtrak argues, *may* have been the final decisionmaker in Burley's case, disciplined engineers #1 and #2, who were charged with multiple safety violations.  APP 249-250, 279-280.

A reasonable jury could find that Burley was treated more harshly because of his race than Engineer # 1, a Caucasian engineer who committed multiple safety violations on November 23, 2007.  Engineer # 1 failed to notify the dispatcher, inspect his train or make proper brakes test *prior* to making a *reverse* move on a MARC train.  APP 649-658.

---

[8]     Burley filed Volume III of the Appendix UNDER SEAL, which contains documents filed UNDER SEAL in the District Court; these identify the engineers whose safety offenses resulted in less discipline than that imposed on Burley.

On the same day, Engineer # 1 failed to release the hand brake on a different MARC train and failed to properly inspect the axle of his train and missed a thirteen (13) inch flat spot on the wheels. Engineer # 1 was allowed a waiver for these offenses and was suspended for 90 days, even though a reasonable jury could find that each of these offenses created major safety issues and far greater risks of personal injury and property damage than the derailment at issue here. APP 649-658. A reasonable jury could find that Burley did not deserve a harsher penalty than Engineer # 1 and that he was treated this way because of his race.

A reasonable jury could find that Burley was treated more harshly than Engineer # 2, a Caucasian engineer who was involved in an accident when he failed to properly line a hand-operated switch for a trailing point movement and damaged the switch. Engineer # 2 was allowed a waiver for this offense. APP 659-663.

A reasonable jury could find that Burley did not deserve a harsher penalty than Engineer # 2 and that he was treated this way because of his race, particularly in light of Engineer # 2's prior safety violation, the intentional nature of Engineer # 2's offense, and that no one else shared any responsibility for these safety violations by Engineer # 2.

## B.    Engineers Disciplined by Sherlock

Burley also presented evidence that he was disciplined more severely than Caucasian Engineer #3 because of his race. Sherlock disciplined this engineer who was charged with multiple safety violations.

On February 27, 2008, Caucasian Engineer # 3, was speeding in violation of NORAC Rule 80 when his locomotive collided with a stopped train. Engineer # 3 was suspended for 30 days. APP 196-197. His suspension was later reduced to five days. This collision caused more than $36,000 in damage, about ten times the damage incurred in the instant matter. APP 664-674.

A year earlier, Engineer # 3 failed a drug test when his "urine sample tested positive for cocain metabolites." APP 664-675. A reasonable jury could find that Burley was treated more harshly than Engineer # 3 because of his race, particularly when Engineer # 3's collision with another train followed so closely Engineer # 3's failed drug test.[9]

This Court is not bound by employer's labels and "must scrutinize the conduct behind those labels to determine if they are applied to similar conduct." *Coleman* at

---

[9]    The documents produced by Amtrak do not appear to include the results of the drug test taken after the train collision.

851 (citation omitted).   The court erred in failing to allow the jury to decide whether Engineer # 1, Engineer # 2 and Engineer # 3 are similarly situated to Burley.

### C.     Engineers Disciplined by Others

Amtrak makes an issue of its supposed commitment to safety and would have the court believe Amtrak is serious about such matters.  This argument opens the door to the admission of the safety records of other Caucasian engineers, who benefitted from Amtrak's lax enforcement of NORAC and Amtrak rules and regulations, who might not otherwise be appropriate comparators because different decision-makers may have made the disciplinary decisions.

A reasonable jury could find that Burley was treated more harshly because of his race than Caucasian Engineer # 4, who was responsible for a March 2, 2008 train collision that caused personal injuries and equipment damage. Engineer # 4 was allowed a waiver for this collision and was suspended for 30 days, despite a previous disciplinary record for safety violations.  APP 674-681.

A reasonable jury could find that Burley was treated more harshly because of his race than Caucasian Engineer # 5, who operated a locomotive over an applied derail on November 18, 2008.  Engineer # 5 was allowed a waiver for this violation and was suspended for three days, despite a prior disciplinary record.  On June 23, 2010, Engineer # 5 passed a stop indication without permission of the Train Director.

61

Engineer # 5 again received a waiver and was suspended for 30 days, despite his previous safety record.  APP 682-694.

A reasonable jury could find that Burley was treated more harshly because of his race than Caucasian Engineer # 6, who was charged with failing to do his duties properly on June 1, 2008.  Engineer # 6 failed to get the permission of the yardmaster and he ran over *two* switches set against him.  Engineer # 6 ran over the same two switches set against him several hours later that same morning resulting in damages to the switches and the derailment of the diesel has was operating.  Engineer # 6 was allowed a waiver and received a 30-day suspension.  According to Amtrak's records, 20 days of the suspension were held in abeyance and not imposed.  Engineer # 6's 10-day suspension was for time served and covered the period between his violation of the safety regulations and his signing the waiver.  APP 695-695.

A reasonable jury could decide that Caucasian Engineers were treated more favorably than Burley because of their race and Amtrak enforces its safety rules selectively.  A reasonable jury could find Amtrak's selective enforcement of its safety rules demonstrates the pretextual nature of Amtrak's explanation for terminating Burley.  *Olsen v. Marshall & Isley Corp.*, 267 F.3d 597, 601 (7th Cir. 2001).

## CONCLUSION

Amtrak's termination decision relied on inaccurate and incomplete documents prepared by Smith and Smith's incomplete and misleading testimony at Burley's hearing. A reasonable jury could find that Smith was Amtrak's decision-maker and that he blamed Burley for the derailment and treated Ebersole less harshly for racially discriminatory reasons.

Appellant respectfully requests this Court to reverse the decision below and remand this case for trial.

Respectfully submitted,

/s/ John F. Karl, Jr.

John F. Karl, Jr.
McDonald & Karl
1025 Connecticut Avenue, N.W.
Suite 615
Washington, D.C. 20036
(202) 293-3200
Counsel for Appellant

## CERTIFICATE OF WORD COUNT

I hereby certify that the attached Appellant's Brief in Times New Roman, 14-pitch conforms to the 14,000 word limit imposed by D.C. Circuit Rule 28(d)(1) and that Appellant's Brief contains 13,485 words.

/S/ John F. Karl, Jr.

John F. Karl, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Appellant's Brief was served on all parties on this 15th day of October, 2014, by electronic means to:

Jonathan C. Fritts, Esquire
Andrew G. Sakallaris, Esquire
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Counsel for Appellee

/S/ John F. Karl, Jr.

John F. Karl, Jr.